You may proceed. Good morning, Your Honor. You may please the court. My name is Douglas Hall. I'm here on behalf of Appellants Allegiant Air and Allegiant Travel Company. I'd like to reserve two minutes for rebuttal. Under the Railway Labor Act, disputes are categorized into one of three types. Representation disputes, which involve whether and by whom groups of employees are represented for collective bargaining purposes. Major disputes, which relate to the establishment of collective bargaining agreements or their amendment. And then minor disputes, which do not relate to necessarily the seriousness of the dispute, but it involves those disputes that require interpretation of an existing agreement. Mr. Hall, there isn't any challenge to the jurisdiction of the district court with regard to a representational dispute, is there? There is. There is. Yes, there is. Okay. So and that's what I would actually like to start my argument with. So thank you, Mr. Tolman. All right. Let's begin with jurisdiction. All right. We believe the Court made errors with respect to all three of these types of disputes. So the nature of the representation dispute, and thus the subject matter of jurisdiction of the district court, was with respect to its requirement in order to render the relief sought by the Teamsters in this matter, it would have to find that the previous group, this APEG group, was indeed a representative for RLA purposes of the pilots and that it had a binding collective bargaining agreement. Those are prerequisites to all of the relief sought by the Teamsters here. That decision whether they were representative was decided by the National Mediation Board, the agency with the discretion and the authority to rule on representation in 2012. Well, I guess they clearly recognized the IBT, but the question is, did they recognize the pilot group? And I don't think the Board was ever asked to make that determination. Well, the Board said our records show that these folks are unrepresented. Right. And anyone with any view to the contrary, speak now or forever hold your peace. But isn't, am I correct, I thought the Railroad Labor Act speaks not only of unions, but also unincorporated associations. I mean, lots of people can be quote-unquote representatives for bargaining purposes. Absolutely. But the NMD found these folks were not represented, whether by a union, an individual, an association, whatever. Help me with a statutory interpretation question. Sure. If the group is, the airline group is a representative, then by definition is an agreement that they make with management an agreement within the meaning of the RLA? Or do we have to ask that question separately once we decide whether or not they're representative? Wow. That's an interesting question, Your Honor. I've never seen a situation. See, in our view, they come, they're hand in glove. Since you don't have a representative, you don't have a collective bargaining agreement. Clearly, if you have a representative, you need a representative in order to have a collective bargaining agreement. Whether any agreement is necessarily a collective bargaining agreement because it's made with a representative, I'm not aware of any precedent on that. I'll just cut to the chase. Sure, please. Here's my problem. I suppose you could have an agreement that's written on the back of a napkin in a bar. Sure. But it would be pretty short of specification. And what's missing, even from the 50-some-odd-page agreement that was hammered out prior to the IBT, is a dispute resolution mechanism that goes beyond simply the open-door policy of your management. So the question that that raised in my mind was, does a collective bargaining agreement have to have, in order to be an enforceable agreement under the RLA, some sort of an adjustment board or some sort of arbitration provision like an adjustment board in order to constitute a cognizable agreement? There is a statutory obligation to create a system board. But if the parties don't and no one complains about it, no individual employee comes forward, would that be enforceable? I don't see why not. But if either party or, again, some employee who felt adversely affected by the lack of a system board complained about it, there is a statutory obligation to create one. But if there were no provision for it in the agreement, then the plaintiff would be left to go to court or pursue any other avenue of enforcing the collective bargaining agreement, wouldn't it? No, I think because the dispute resolution process that was agreed to in lieu of a system board had a terminus. The terminus was take it up through the open-door policy up to including the chairman. But my question was, following up on what Judge Tallman asked you, that that doesn't make or break a collective bargain agreement if there is no dispute resolution clause in there, does it? Well, that's a very interesting question, because the courts have gone out of their way to say we don't have jurisdiction. The Railway Labor Act was not structured to get courts involved very often. The courts' roles are very limited depending on the type of dispute involved. And with minor disputes, you certainly don't want to be acting as an arbitrator, trying to interpret things in the airline industry on, you know, a — your docket would be more flooded than it already is. But if the parties have neglected to put into their agreement what's contemplated by the Railway Labor Act, then would that preclude the courts from taking up the issue at that point? Boy, I think in a situation like that, where there has been no dispute resolution process created whatsoever, then I think you could have a situation where a court would say you have to create one pursuant to the statute. I don't think a court is going to find it's appropriate for it to be exercising jurisdiction over minor disputes. Those are intended to go to experts in the industry rather than courts. It's a little bit of a chicken-and-egg problem, because if there is no agreement, then there's nothing the court could look at to determine whether the dispute is major or minor, because that has to be the case. Right. If there's no agreement, that's right, absolutely. If there's no agreement, there's no obligation to create a system board. But that's my point. Does that mean there's no agreement just because there's no clause in there to resolve any disputes? Does that necessarily mean that there is no collective bargaining agreement? No, I don't believe it would, Your Honor. Well, the problem is that the RLA doesn't define agreement. And the agreement that it does contemplate, as I read the case law, is a collective bargaining agreement. And the question is, was this agreement a collective bargaining agreement? Right. In our view, first of all, going back to the jurisdictional point, the reason we feel there's no jurisdiction here is the NMB, as part of its process in handling representation disputes, it has to make a series of decisions leading to whether or not a certification will issue. That involves eligibility. That involves craft or class determinations. It involves whether a hearing will be. There's a whole panoply. And all of those are given the same level of deference. This is where the district court went off the rails, pardon my pun. It said that the only – it said that the only – Off the rails or off the runway? Yeah. In this case, off the runway. The district court erroneously thought the only fact-finding that was entitled to any deference was the ultimate certification. And he said, I'm not, you know, doing something that's a certification. That's not correct. All these decisions about whether people can participate in an election, what the craft or class will be, all of those decisions are subject to the same hands-off approach by the judiciary. And in this case, it was whether or not the folks were represented. If we had a suit here where the Teamsters or some other group came in and sued the NMB saying, we think your decision that APEG was not the representative was wrong, we wouldn't be – clearly, that would be a representation dispute. They're trying to do the same thing here. Why would the Teamsters ever bring that action? They are now the duly certified representative by the NMB of the pilots, and they are in the process, I take it, of negotiating a full-fledged collective bargaining agreement with your client. By the way, what's the status of those? It's still being negotiated. Still being negotiated. You know, you have a bad habit of speaking when my colleagues are speaking. I apologize. And I have a hard time listening to my colleagues when you're interrupting them. My apologies. Go ahead. Thank you. Thank you for the warning. The negotiations are still ongoing. So I guess my point was, this decision, if it had gone directly as a challenge to the National Mediation Board's finding, and in this particular case, the IBT wouldn't have any reason to do that. But if APEG had done it or the company had done it or in some other case, some other entity had challenged a decision about whether the employees had been unrepresented or not, I think clearly that would be a representation dispute subject to the very limited analysis that the court can give to this. But getting back to Judge Rawlinson's question, let's assume that there was no prior representative. Let's assume Allegiant is newly formed and the IBT is the newly certified representative. To the extent that there was some kind of an understanding between management and its employees before certification, wouldn't the remedy for this dispute be to file a breach of contract action in state court for breach of whatever that agreement was? Well, certainly if the pilots prior to IBT certification felt that the pilot work rules were not being abided by, there was the open door policy. In our view, that was the exclusive. The problem here is that it's management who is announcing unilaterally, we're going to change this the way we schedule pilots. And that's a big reason why the fact that this ended up in that kind of dispute resolution process is to us evidence that this wasn't a collective bargaining agreement. That's not how collective bargaining agreements work. So in our view, the fact that there isn't a dispute resolution process involving arbitration shows that this was not ever intended to be a collective bargaining agreement. So to our — to your point, I certainly — So your position is that the 50-page contract was not a collective bargaining agreement? Correct. What was it? It was a mutually acceptable arrangement that the company was willing to enter into but not necessarily was not legally bound to in order to keep its pilots satisfied. And that it was not under any obligation to comply with it. So they wouldn't even have a cause of action for breach of contract? Not in the company's view. That's correct. Because we did not view this as a contract. Boy, it sure looks like one with all of the legal formalities and the signature. Well, it says right on it. I'm sorry, Your Honor. No. It says right on it this is not a contract. Nothing in there is intended to make this a contract. And I'll raise this March 2012 APEC brochure where they say up and down, we don't have a contract. So APEC itself, right before the Teamsters started this campaign, they acknowledged we don't have a contract. We don't have a legally binding contract. If we organized as a union, we would be starting off without a contract. We don't want to take our 40 pages of work rules and turn them into a union contract. They realized that they didn't have a contract. And no one ever thought otherwise. The pilots, IBT, even when there was a previous union drive in which several of the same members of the IBT organizing committee served on, they said this is not enforceable. This disclaimer says it's not a contract. And, of course, it's not a contract. But it's not a contract with an individual pilot. That's usually what that language is. It's not enforceable individually by an individual pilot. But let me ask you this. The RLA defines a representative as any person or organization designated either by a carrier or group of carriers or by its or their employees to act for it or them. Why doesn't APEC meet that definition of being a representative? Because they never obtained that. That's why it defines a representative. It doesn't talk about how you obtain the right to represent. And there's only two ways to do that, certification through the NMB or voluntary recognition. What we have here, Your Honor, is what we talk about. What says that, that there are only two ways to become a representative? What are you relying upon? What authority are you relying upon to say that there are only two methods by which an organization can become a representative? Well, I guess the lack of precedent that there's ever been any finding that you can sort of inadvertently create a voluntary recognized scenario. Either you're involuntarily recognized through the certified, through the certification process where the company has objected, or the company and the union agree and you have a voluntary recognition. I've never been aware of any third way under the Railway Labor Act. Well, if the parties act as if this is a representative relationship, then why isn't that adequate to confer that status upon them? Well, it's very common in the industry, Your Honor, for committees like this to be used with unrepresented employees. We cite numerous cases in which this has occurred, the Horizon case probably being the most significant of them, which ended up before this Court. In none of those cases have the National Mediation Board ever considered that to be a representative. Rather, they've acknowledged these employee committees are fine. They're ways to work with employees, to keep them happy, to without having a union — when you have a unionized or represented workforce, there are a lot of obligations that go with that. If you're the representative, you have to comply with the Labor Management Reporting Disclosures Act. You have a duty of fair representation. If you're management, you have the risk that your employees will go out on strike. But the association didn't comply with all those formalities, right? They did not. They did not. And that's why we think that they're not a representative. That's one of the reasons we think they're not a representative. One of many. But these organizations — I'm struggling with the same question that Judge Rawlinson asked you about. I read Section 151-6 to say that a representative could be one person. I mean, it could be the chief — well, I guess it wouldn't be the chief pilot, because I guess he's management, or she — the most senior pilot, who's not the chief pilot. The company could look at the most senior pilot and say, we're going to deal with you on workplace rules. And is it your position that the NMD would have to certify that single individual as a representative in order for the RLA to apply? It would either have to be certified or voluntarily recognized. Because if you're having this person be the representative, then they're representing everybody. So there has to be some process, and there has to be some knowledge by — what if this pilot comes forward and says, these 12 pilots have asked me to come to you because they're unhappy with this issue? And then another pilot comes forward and says, these other 12 pilots have asked me to come forward with you. Well, as I understand it, were all pilots members of the association prior to the team — prior to the election? Well, not all of them paid dues, and so I don't know if they were all members. Well, but they obviously benefited from the agreement that was negotiated between the association and management, did they not? Sure. But as I said, these employee committees are quite common, and they've always been recognized by the National Mediation Board to be something that's not a representative, but yet works with management on issues of importance to the employees. In fact, in the Horizon case, the level of representation — I use quotation marks there — that the PIREPS group provided went far beyond what occurred here. They had agreements that they said were binding with them. So, counsel, that brings me to the point of the chief executive officer, Mr. Gallagher, who said that Allegiant Pilots have made significant gains in every new contract since 2001. Why isn't that indicia of voluntary recognition of the group as a representative? Well, first of all, APEG wasn't around until 2005. So by referring to contracts, he's obviously not referring necessarily to agreements that the company reached with APEG. He's referring generically to these pilot work rules that before APEG existed were created unilaterally by the company. But he called them contracts, though. Well, moreover, at the time he said that, Your Honor, the version of the PWR in existence specifically said the company has the right to amend these rules without notice. So that by itself, under basic contract law, indicates it's not a contract. Well, it indicated voluntary recognition, if nothing else, whether or not he legally implied it was a contract. But doesn't that show voluntary recognition of the collective bargaining, of bargaining? Sorry, Your Honor. It certainly shows that we understood these folks were doing work on behalf of the pilots, but voluntary recognition for purposes of the Railway Labor Act is a very different thing. And Mr. Gallagher was quite clear in his testimony he had no interest in ever voluntarily recognizing an RLA representative. He had been down that road in previous airlines. He understood the divisiveness, the risk of strikes, and how that can affect an airline. He was not interested in that. So the voluntary recognition, in our view, requires both an acknowledgment that the organization or individual wants it and the company is willing to grant it. And there was the evidence does not show that. In fact, you look at the testimony of the AIPAC officers who testified. They didn't know what the Railway Labor Act was. They didn't know anything about their rights that they would have if they were a representative, such as getting the National Mediation Board involved in mediating their dispute or going out on strike. The district court, I want to get back to the waiver clause or the disclaimer clause, I guess. The district court thought that that clause was limited to establishing an employment contract in a right-to-work state. Yeah. And two things on that. First of all, there was no evidence on that. The only evidence that was presented was from Mr. Gallagher, who had been there, and the only one who had been there from the beginning of the PWR, who said he put it in there. So it was clear it wasn't a contract. Well, it wasn't a contract so that an individual pilot who was terminated would be able to bring an individual claim against the company saying that he had a contractual right to his job. His testimony was broader than that, Your Honor. There wasn't a union contract. No, I'm asking how the district court interpreted that evidence. Right. And that's how I understood. And I didn't understand the district court's ruling there, because by saying this was intended to maintain their at-will status and prevent them from arguing that they had a cause of action, that's inconsistent with it being a collective bargaining agreement, is to eliminate your at-will status and provide you with a right of action if you're terminated. Well, I mean, it usually includes provisions that if you're going to be terminated, certain steps have to be followed, including a right to grieve the termination. And that you have to have just cause to do so. Which this contract doesn't say anything about. That's right. All right. I think we have your argument in mind. Thank you. Let's hear from the union. And I should say to the clerk of our court, it looks like we may have reversed on the day sheet, the counsel. So I think we need to get that corrected, just so there's no confusion as to who was representing whom. All right. Counsel, you may proceed. Good morning. May it please the Court. Nathan Ring on behalf of the International Brotherhood of Teamsters Airline Division. The district court's order granting preliminary injunction to the International Brotherhood of Teamsters should be upheld because the district court did not abuse its discretion in granting the injunction to preserve So let's start with jurisdiction before we get to whether or not an injunction should issue. Can you address that first? Absolutely, Your Honor. Jurisdiction does exist in this case. It is not involving a representation dispute. If you look at the case AFA v. U.S. Air, which was cited in the briefs 24F, 3rd, 1431, there the D.C. Circuit considered what was argued as a representation dispute and decided it wasn't a representation dispute and the court could have jurisdiction. What the court looked at there, and it's on page 1441 of that decision, was that all parties accepted AFA as the employee's current representative. The former representative, which was the Transport Workers Union, was not a party to that case and they weren't claiming any rights under the prior agreement. Here, APEG is not claiming rights under the PWR agreement. They're not a party to the case and they are, in fact, a defunct entity. There's no dispute among Allegiant or the IBT that the IBT was certified as the representative of the pilots. In addition, when you look at the Supreme Court's decision in Swishman's Union v. NMB, that case isn't the very fact that the company and the Teamsters disagree about the status of the APEG sufficient to trigger a question of whether or not  Is that the Constitution Board's decision on that? I mean, that's what the statute's there for, right? No, Your Honor. Actually, when you look at some of the case law under that statute, and particularly the IBT v. Texas International Air case, what the court says, the Fifth Circuit says in that case, is the question in a representation dispute is who is to represent the crafter class. Here, there's no dispute that the pilots are represented by IBT. Now, we're backward looking and looking at APEG to determine whether they were a representation dispute, because a representation dispute is looking forward who is going to represent or who is to represent the pilot. Well, then what triggers jurisdiction under the Act? Jurisdiction under the Act is going to be triggered by an application by a participant or a party when there's a dispute among who does represent employees or a crafter class of employees. But you just told me there's no dispute as to representation, right? Right? I did tell you that, and there actually is no representation dispute. Because the IBT is the representative now, it was the representative as of the time it was named representative through the election in August of 2012. When we're looking at APEG, APEG is not requesting, IBT is not requesting that APEG be recognized now. What they're looking at is whether, and the district court said it in this decision, whether in 2010, when the PWR was amended and then ratified by the They weren't looking at or questioning the NMB's decision that APEG wasn't the representative in 2012. Now, it may be that APEG was a defunct entity as early as March of 2012, which was the argument by a legion in the district court. But simply because APEG no longer existed as a representative or as a defunct entity, it doesn't mean that the CBA that was in place, the PWR agreement, doesn't continue on. Because the case law makes clear, and that's also in the AFA versus U.S. Air case, that the agreements are between the employees and the carrier, not the representative and the carrier. So is your position in response to my question to Mr. Hall that the determination as to whether or not the agreement is a collective bargaining agreement is not linked to whether or not there was a representative under the RLA? I would not say that you have to have a certain representative or a certified representative for a CBA. But you do have to have a representative. And actually, the RLA doesn't speak in terms of collective bargaining agreements, but in labor law, that would be the parlance that's used. A collective agreement under the RLA does require a representative. And whether that's voluntarily recognized or a certified unit pursuant to NMB, the collective bargaining agreement itself, and you pointed out previously that the act is not clear on what is included in an agreement. I think what I heard in that long answer was, yes, our position is that you don't have to have a representative in order to create a collective bargaining agreement. The response was that you don't have to have a certified representative. Right. So that it could be, under my hypothetical, the most senior pilot among allegiance pilots who was the spokesperson who bargained for the terms of what we're calling colloquially a collective bargaining agreement that existed prior to the Teamsters being certified as the representative. Well, in that factual scenario there, you would have to have the pilots naming the representative or electing the representative. It can't be something that's bestowed upon a person by the carrier. Why couldn't management say we're only going to deal with the most senior pilot in deciding what work rules are going to be binding on all pilots that we employ? In that case, would there be an enforceable agreement under the RLA or not? I would say under that circumstance there wouldn't be an enforceable agreement. When you look at the term representative under the RLA, the statement is that any person or persons, labor unions, organization, or corporation designated either by a carrier or group of carriers or by its or their employees to act for them. So is your response to Mr. Hall's position that under Article 1-6 there, the representative does not require any formal recognition by the NMB? It doesn't require formal recognition by the NMB. And the NMB's case handling manual actually says that voluntary recognition can also be granted. In this case, when you look at the PWR specifically, the 2010 PWR, that agreement states on page 89, pardon me, the Supplemental Excerpts of Record page 89, that the agreement is between and may be amended with coordination of Allegiant Air Pilots Advocacy Group, APEG, who is the elected and representative body of the pilot group of Allegiant Air. Allegiant attempted at the district court, and they attempt here to argue that there was no voluntary recognition. But that agreement itself is signed not only by APEG and its president, but also by Greg Baden, the vice president of flight operations for Allegiant Air. Well, that's why I was pushing Mr. Hall. I mean, it looks like an agreement. It has all of the formalities. It's clearly a contract of some sort. At least that's how I see it. Maybe under later law I'm not looking at it correctly, but that's what it looks like to me. And that's IBT's position, is that it is a contract. Despite the disclaimer clause, which APEG has pointed to, that disclaimer clause, if you read it in its context, it says nothing in the agreement should be, nothing in the document should be interpreted as giving rise to a contract or promise of employment for a certain period of time. I mean, this is a common at-will disclaimer that's seen in dozens and dozens, maybe thousands of contracts. I mean, the issue, I guess, would be if a dispute had arisen over work rules as opposed to any one pilot's continued employment, that I think your argument is that disclaimer clause doesn't address a dispute that might arise for breach of the contract because management had done something to change one of the terms of the contract. Right. And the disclaimer clause, certainly, when you're talking about just cause, there wouldn't be any type of grievable offense that would occur if someone was just fired for wearing a blue shirt one day, as an example of an at-will disclaimer. Now, certainly the majority of collective agreements are going to have a just cause termination provision, but the RLA doesn't require that. In fact, when you look at Section 152, 45 U.S.C. Section 152, when it talks about agreements, it says that the representatives and the carriers must make agreements on rates of pay, rules, and working conditions. And when you look at the PWR itself, that 2010 PWR, it has information on rates of pay, it has information on rules, and it has information on working conditions. But it doesn't have a dispute resolution mechanism beyond go talk to the chain of command up to and including the chairman of the board. It is true that it doesn't have a dispute resolution mechanism. And when you look at the open door policy itself, that's actually not even a mandatory policy. It says that pilots are strongly encouraged to use the open door policy. So my question is, you know, is a core portion of a bargaining agreement under the RLA limited to rates of pay, rules, and working conditions, or does it also Under Section 152, you would have the rates, pays, and working conditions that would be in the agreement. When you look at 45 U.S.C. 184, it requires the representatives and the carrier to form a system board of adjustment when they have an agreement. Now, because this did not have a system board of adjustment, it doesn't mean it's not an agreement. It just means that this agreement did not have a system board, which it was required to do under 45 U.S.C. 184. So your position is that the district court properly included in the injunction an obligation on management to bargain in good faith over the creation of an adjustment board? Yes, that is the IBT's position. How can that be? Because the court conceded that that was a minor dispute over which it had no  Your Honor, I believe the court's decision wasn't that the system board of adjustment was a minor dispute. I believe it was that one of the disputes that was raised and asked for a status quo injunction by the IBT was a minor dispute and therefore required a system board of adjustment. So under what auspices did the court direct that the board be created? What was How did the court get there procedurally? The court got there procedurally by looking at the open door policy and saying that the open door policy was a futile attempt. It would be a futile attempt for IBT to use the open door policy because when you're just going up through management and it had already been made clear by the two highest management officers, Captain Baden as well as the CEO, Maury Gallagher, that they believe what they did was fine. Did the court find that to be a major dispute? I'm sorry, was the question that the court Was that a major dispute over which the court had jurisdictional authority? The court did not find that the lack of a system board of adjustment was a major dispute. But I believe when the court looked at it and you look at Section 184, it requires a system board of adjustment. And certainly the court could no more argue the use or no more institute the use of the open door policy, which is in violation of 184. When you have an agreement between a representative and a carrier, then the court could specifically enforce, for example, a contract to buy or sell drugs. I guess I understand Judge Rawlinson's concern and I share it. Did this injunction go beyond simply preserving the status quo? It seems to me that if it imposes an affirmative obligation on the part of both management and whoever the representative is deemed to be to now bargain in order to create an adjustment board, that's changing the terms of the contract, is it not? Why didn't the teamsters just go to the NMB and say we've got this dispute with regard to the change in the rules and work conditions and ask for the NMB's assistance to mediate the dispute? They're already in bargaining over the agreement now. And when you're talking about making a decision on a dispute, the NMB is not an adjudicatory body. They're not able to go to the carrier and go to the representative and say you must institute. No, no, I understand it's not mandatory, but don't they frequently make their services available in order to help maintain labor peace by mediating disputes? I mean it's like us sending appellate cases to the Ninth Circuit mediators in the hope that they can help the parties reach a resolution so that we don't have to decide the case. And, unfortunately, we were in a mediation here. I did note that. I did note that. I'm not casting aspersions on any side for failure to resolve it through mediation. The mediation under the National Mediation Board, that mechanism has been in place since the IBT filed its Section 6 notice. And Mr. Gleason would know more about the negotiations than I do and what's been going on in that process. But for purposes of the System Board of Adjustment, yes it may be requiring an institution of the System Board of Adjustment in the court's injunction. But Federal law, the Railway Labor Act, Section 204, which is 45 U.S.C. 184, requires an institution of that. And without that, I would say that the PWR is actually in violation of Federal law and it can't be enforced through the open door policy for that reason. Can I change the question just a little bit? Mr. Hall has a position on the PWR, which he laid out. But he would urge us, and I think we would all agree, that before we even construe what the PWR is, we have to determine whether or not APEG was a representative. We've talked a little bit about that. Significantly, it appears that the APEG never submitted reports pursuant to the Department of Labor. There is mixed evidence about whether or not the pilots themselves believe that the organization was a representative. Wouldn't the failure to file the reports alone lead us to conclude that the district court erred in determining that APEG was a representative organization? The fact that there wasn't any such reports, along with the other anecdotal and testimonial evidence, would lead to a finding that it wasn't a representative group, therefore no contract, nothing to challenge and appeal over. The failure to file the LMRDA forms is something that's punishable in Federal law by fine and imprisonment, simply because the organization failed to file the LMRDA forms. When you look at the record, it was very clear that APEG was not acting through attorneys and didn't seek out the advice of counsel in this process. They did file as a 501c5 nonprofit organization with the IRS, which is something that labor organizations do. Now, whether that was something that the pilots did. Okay, but that permits the pilots to deduct the dues from their tax returns. That doesn't really address Judge Murphy's question, which is if these forms are so important under labor law that you go to prison for failing to file them and the association didn't file them, isn't that a relevant consideration in determining whether or not it's a representative within the meaning of the RLA? It certainly is a relevant consideration, and the district court did consider it, but the district court also weighed a lot of additional evidence in determining whether or not APEG was the representative. When you're looking at this. Well, but as I understand his question, I mean it's sort of irrelevant as to what the parties did, either through ignorance or by design. If that is a key factor, maybe the sole factor in determining representative status, then you lose. In other words, should the Ninth Circuit find its dispositive? It's a question I don't think the court has ever addressed before. The LMDR issue with not filing the forms is not a dispositive issue, because when you look at that statute itself and the requirements to file these forms, they say if you are a labor organization, you must file these forms. It doesn't say in the inverse. If you don't file these, you aren't a labor organization. So it's punishable by criminal offense if you are a labor organization and don't file them. So the labor organization actually comes first. And in this circumstance, you have representatives under the RLA, which would be a labor organization pursuant to the terms of the RLA in Section 151. Counsel, may I ask you, what is the standard of review that we are to apply when we determine whether or not there was a contract between the airline and the pilots? What's our standard of review? The standard of review based on the court's factual findings is a clearly erroneous standard. Its application of the law is going to be de novo. But when you look at the circumstances of this case and the facts that were found by the district court, application of Eastern Airlines v. ALPA is an important consideration from the 11th Circuit. And they said there are five objective factors in determining whether there was a collective bargaining agreement. One is bargaining history, which the parties had here. Two is it must be reduced to writing, which the PWR was in 40 to 50 pages. It must be ratified by the union. It was sent out to the pilots and ratified by over 90 percent of the pilots. In addition, their bylaws were also sent out to the pilots and ratified to show they were representative. Did the court make those findings? Did the district court make those specific findings on those factors? The court did not make specific findings on these factors, but the court did look at the factual circumstances as well as the statements by management representatives, including the CEO, Maury Gallagher, stating that significant gains had been made in every contract. And an additional consideration would be the SEC 10-K filings from Allegiant Air. If you look at those from 2009 to 2010, those clearly state that they reached an arrangement with the in-house pilot association on pay and benefits, and it's not amendable until 2013. So how could it be anything else but a binding contract if it's not amendable for a certain time? Anybody have any other questions? Okay. Thank you very much. And, Mr. Hall, I'll give you a couple minutes on rebuttal. Mr. Hall, would you address the issue I asked about the standard of review? Just about to, Your Honor. Thank you. The answer to your question is it's de novo. Whether a contract or a collective bargaining agreement exists is something that this Court reviews de novo. We cited several cases in our reply brief, including the Ninth Circuit's decision in Federation of Agent and International Reps, as well as decisions from the Eighth Circuit and Second Circuit that go directly to that issue. All right. Thank you. And the Alpa v. Eastern case, I'm not really familiar with Mr. Ring's description of it. The Alpa v. Eastern case that was cited was strictly a major-minor dispute issue about whether an airline's decision to contract with a third party was major or minor. I don't recall it getting into this issue of standard of review or what was the CBA. Well, the only problem I have with saying this is strictly de novo review is it seems to me it's a mixed question of fact and law, is it not? Well, those are subject to de novo review as well. Well, except that we have to review the factual findings under a clearly erroneous standard, and then the application of the facts found by the district court has to inform our review of the court's resolution of the legal question, does it not? Well, and further complicating things, this is a preliminary injunction standard, right?  And a mandatory at that. So it's got clearly erroneous components. It's got abusive discretion. And it's got de novo review. I'm not sure that is very helpful to us. But also they have to make sure by a clear showing that they're entitled to the extraordinary and drastic relief. So we don't think that standard was met. If the questions are factual or going back and forth, that's more appropriate for a permanent injunction, if at all. If there's anything further? I don't have anything. This is an interesting little problem. I must say. We'll wrestle with it and get you an answer as best we can. But thank you, both sides. Who's at the table with you, Mr. Ring? Thank you. All right. The case just argued is submitted. Thank you to both sides. We'll get you an answer as soon as we can. And with that, I believe we are adjourned for the day. Thank you. Thank you.
judges: Murphy, Tallman, Rawlinson